UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| TONY BALL ) | |
| ) | |
| and ) | |
| ) | |
| RAMONA JOHNSON ) | |
| ) | |
| Plaintiffs ) | |
| v. ) | Civil Action Numbers: 07-2192 and |
| ) | 07-2193 (consolidated) (RWR) |
| ) | |
| ) | |
| MICHAEL CHERTOFF, Secretary ) | |
| Department of Homeland Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**PLAINTIFF RAMONA JOHNSON'S OPPOSITION TO MOTION TO DISMISS**

Seeking retribution for the "sins of [her] husband" the United States Secret Service reneged on a promise to reassign Plaintiff Ramona Johnson to Miami Florida, so that she could live with her husband, Special Agent Tony Ball. Ramona Johnson is an exemplary employee who works as an IT Specialist in the Secret Service's headquarters, here in Washington. Special Agent ("SA") Ball is a decorated agent with an outstanding service record who has risked his life to protect the President, Vice President and other public officials of this country. His "sin" was his continued participation as an active member of the class of African-American agents who have sued the Secret Service for a longstanding pattern of race discrimination on the job.

The Secret Service has a practice of keeping families together if an agent is moved to a new location for assignment, and the agency had agreed to transfer Ms.

Johnson from Headquarters to Miami.  Indeed, Ms. Johnson's supervisor had confirmed

in correspondence to a mortgage lender that Johnson was being reassigned and would

remain employed with the Service so that she and Ball could obtain financing to purchase

a home in Florida.  Defendant reversed course, however, and pulled the plug on

Johnson's transfer, because Ball would not drop his claims of race discrimination against

the Service.

In this lawsuit, Johnson contends that the Secret Service's refusal to transfer her

was retaliatory and violated Section 704(a) of Title VII of the Civil Rights Act of 1964.

She seeks, among other things, equitable relief requiring defendant to transfer her to

Miami so she can continue to work for the agency and live with her husband.

The Secret Service now seeks to dismiss Johnson's lawsuit, arguing for an

interpretation of Title VII which would leave family members wholly unprotected from

this type of obvious and malicious retaliation.  According to defendant, Title VII would

permit the agency to harass, punish, even fire Ms. Johnson – *precisely because* her

husband had asserted his civil rights -- and she would be entitled to no relief from the

courts.  This is a disturbing enough proposition when advanced by a private litigant.  It is

all the more so when advocated by the lawyers for the United States government.

There has been division among the courts that have addressed this issue, and

Defendant points to a handful of decisions from other jurisdictions finding (often

reluctantly) that an unintended gap in Title VII's coverage leaves family members who

are targeted for reprisals outside of the protections of the statute.  But that is not the law

here; courts in the District of Columbia have upheld such claims, and this interpretation

of the law is more faithful to the legislative purpose of Title VII's broad prohibition on

reprisal, more consistent with the Supreme Court's recent decisions addressing work-place reprisals, and supported by the Equal Employment Opportunity Commission. This Court should not adopt a contrary interpretation.

Finally, even if defendant is correct in its stingy interpretation of Title VII's reach, and it is not, Johnson would still be permitted to pursue her claim because the agency viewed her as a participant in her husband's EEO activity; indeed, it noticed her deposition in that proceeding. Even those courts adopting defendant's proffered interpretation of the statue would extend coverage to family members in such circumstances. The Motion to Dismiss should be denied.

## FACTS

Tony Ball has been a Special Agent in the United States Secret Service since 1989. He has an exemplary service record. During his career, he has served on both the Presidential Protective Detail and the Vice Presidential Detail. He was promoted to the GS-14 grade as a spokesman for the Secret Service in the Office of Public Affairs and was subsequently a supervisor in the Secret Service's internal compliance section, the Inspection Division. [Consolidated Complaints (hereafter "Complaint"), ¶ 6] SA Ball is married to Ramona Johnson, who is also a Secret Service employee serving as an IT Specialist in the Headquarters located here in Washington, D.C. Prior to her employment with the United States Secret Service, Ramona Johnson served for nearly five years in the United States Air Force. She is a disabled veteran with an outstanding service record. [Id.]

In June 2005, Ms. Johnson was hired by the Secret Service as a GS-9 IT Specialist in the Network Branch of the Information Resource Management Division.

Her service in that position has at all times been exemplary, and she was promoted to GS-11 in July 2006.  [Id]

SA Ball has been an active member of the class of African-American Special Agents alleging a broad pattern of race discrimination in employment at the Secret Service.  *See Moore, et al, v. Chertoff*, C.A. 00-953 (RWR).  SA Ball also filed an individual Complaint of Employment Discrimination on August 24, 2005, alleging that he was denied promotion to the GS-15 level because of his race (African-American).  His promotion claims are now a part of the larger class claims, and he was deposed in that lawsuit.  [Complaint, ¶ 2]

SA Ball was notified in December 2005 that he would be promoted to a GS-15, but the promotion was contingent on his accepting a geographic transfer to the Miami Field Office.  At the time, both SA Ball and Ramona Johnson were stationed in Washington, D.C.  SA Ball was assigned to the Vice President's Detail and Ms. Johnson worked as an IT Specialist in the Network Branch, IRM Division.  In order to accept the promotion, SA Ball was required to move to Miami, Florida.  [Id., ¶ 8]

SA Ball had alleged in his administrative complaint of discrimination that, unlike its treatment of white Special Agents, the Secret Service frequently required African-American Special Agents to relocate from the Washington, D.C. area to be promoted to the GS-15 level.  The terms of the promotion SA Ball received in December 2005 (requiring him to geographically move if he desired promotion) mirrored that claim.  For this and other reasons, SA Ball continued to pursue his EEO complaint after his selection for promotion.  Because SA Ball continued to prosecute his claims of racial

discrimination, the Secret Service retaliated against him and his wife, Ramona Johnson.
[Id., ¶ 9]

The Secret Service's established practice is that when a husband and wife are both
Secret Service employees, the spouse of a transferred employee is transferred at the same
time.  [Id., ¶ 10] Beginning on the day they learned of SA Ball's promotion, and
continuing at every step in the process of preparing to relocate their family from
Washington, D.C. to Miami, Plaintiffs Johnson and Ball were reassured that Ms. Johnson
would be transferred.  For example, on the evening in December 2005 that SA Ball
received a telephone call informing him that he had been selected for promotion, Ms.
Johnson contacted her supervisor, Cedric Sims, Chief, Network Branch, IRM Division, to
ensure that she would also be transferred to the Miami Field Office with her husband.
Chief Sims assured Ms. Johnson that because SA Ball had been transferred, she would
also be transferred.  Throughout the following months, Chief Sims assured Ms. Johnson
that the Secret Service "keeps families together."  [Id., ¶ 11-12]

Likewise, before placing their Washington, D.C. home on the market, SA Ball
spoke to both the Deputy Assistant Director of the Secret Service in Ms. Johnson's line of
command, Deputy Assistant Director Frank Larkin, and in his line of command after his
transfer to Miami, Deputy Assistant Director Anthony Triplett.  Deputy Assistant
Director Larkin told SA Ball he had already "signed off" on Ms. Johnson's transfer to the
Miami Field Office.  With reference to Ms. Johnson's transfer to the Miami Field Office,
Deputy Assistant Director Triplett said he would "get it done."

Before SA Ball reported to the Miami Field Office, the Special Agent in Charge
of the IRM Division, Cornelius Tate, assured Ms. Johnson that her transfer was "going to

happen." In reliance on these numerous assurances, SA Ball and Ms. Johnson sold their Washington, D.C. area home, moved into temporary housing, went on a house-hunting trip to the Miami area for which Ms. Johnson was required to utilize annual leave, and entered into a contract and paid a deposit on a home in the Miami area. SA Ball and Ms. Johnson relied on the assurance that both of them would continue to be employed by the Secret Service in selecting the home that they purchased. [Id., ¶ 13-15]

On April 17, 2006, SA Ball reported to the Miami Field Office. After SA Ball reported to the Miami Field Office, SA Ball and Ms. Johnson again received reassurances from their supervisors that Ms. Johnson would be transferred to join SA Ball in the Miami Field Office. For example, in late-April, 2006, Chief Sims pulled Ms. Johnson aside and confirmed that the "uppers" had signed off on her transfer to the Miami Field Office in the Network Division. He told her that the transfer was "a done deal" and there were only some administrative details remaining. Similarly, shortly after his transfer to the Miami Field Office, SA Ball's Special Agent in Charge, William Sims, informed him that Ms. Johnson's Special Agent in Charge, Cornelius Tate, had called the Miami Field Office and repeated to Special Agent in Charge Sims that Ms. Johnson's transfer was approved. [Complaint, ¶ 16-19]

These reassurances culminated in a written assurance to SA Ball and Ms. Johnson's mortgage company. In May, 2006, SA Ball and Ms. Johnson closed on their new house in the Miami area. Their mortgage company required an assurance that Ms. Johnson would be transferred to a Secret Service position in the Miami area. On May 16, 2006, Chief Sims emailed the mortgage company, "Thank you for the time to discuss Ms. Johnson's transfer to Miami. As we discussed, by virtue of her husband's transfer to

Miami, Ramona Johnson is also transferred to Miami.  Please accept this message as a confirmation of her transfer.  You may call me if you have any questions."  [Id., ¶ 20]

On June 8, 2006, SA Ball filed his request for a hearing with an EEOC Administrative Judge regarding his 2005 EEO complaint.  On Friday, July 28, 2006, Chief Sims told Ms. Johnson for the first time that "nothing is in the works" with respect to her transfer to the Miami Field Office.  As an explanation for this abrupt change in plans, he told her: "it is a shame you have to pay for the sins of your husband."  [Id., ¶ 22]

Chief Sims and Special Agent in Charge Tate have both admitted that the Secret Service's deviation from its established practice of moving spouses together was as a result of retaliation.  Chief Sims reported to Ms. Johnson the process was "normally smooth," but SA Ball had "pissed off the Eighth Floor."  Similarly, Special Agent in Charge Tate reported to Ms. Johnson that such a transfer was "not normally an issue," but the SA Ball had "upset the Eighth Floor."  The Eighth Floor is where the leadership of the Secret Service – including the Director, Deputy Director, and Assistant Directors – sit.  [Id., ¶ 23]  The action of SA Ball that "pissed off" or "upset" the Secret Service leadership was his decision to file and pursue an EEO complaint, which is protected activity by law.

**ARGUMENT**

### A.  TITLE VII PROVIDES STANDING TO SPOUSES WHO ARE TARGETED FOR RETALIATION

In *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006), the Supreme Court reaffirmed the broad sweep of Title VII's prohibition on

employer reprisals, holding that § 704(a) prohibits any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

> An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace. *See, e.g., Rochon*, 438 F.3d at 1213 (Federal Bureau of Investigation retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (CA10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. *Hence, such a limited construction would fail to fully achieve the antiretaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms.*" Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).

*Burlington Northern,* 548 U.S. at 63-64 (emphasis supplied).

It is a cruel, but effective form of retaliation to punish family members who also rely upon the employer for their livelihood. "To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations." *NLRB v. Advertisers Mfg. Co.*, 823 F.2d 1086, 1088 (7th Cir. 1987). Permitting employers to punish family members in reprisal for the exercise of protected activity would undoubtedly chill the enforcement of statutory civil rights. Adopting this interpretation of Title VII subverts the "primary purpose" of § 704(a) --"[m]aintaining unfettered access to statutory remedial mechanisms." *Burlington Northern*, 548 U.S. at 64 -- and is therefore actionable.

Defendant argues that the language of the statute does not expressly forbid retaliation against family members, and Johnson's complaint must therefore be dismissed. Section 704(a) provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3.

Defendant asks the Court not to concern itself with whether such a construction contravenes the obvious purpose of the statute, and to engage only in a literal reading of the term "he." According to defendant, because Johnson herself did not file a complaint of discrimination, she was fair game for reprisal.

However, "[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute[.]" *Bob Jones University v. United States*, 461 U.S. 574, 586 (1983). Thus, "in interpreting a statute, the court will *not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law*. . . ." Id. (emphasis supplied).

Indeed, just this term, the Supreme Court construed two civil rights statutes as precluding retaliatory employer conduct, even though they contained *no* language addressing the issue of reprisal. *See CBOCS West Inc. v. Humphries*, 128 S. Ct. 1951 (2008) (finding an inherent right to be free from reprisal under 42 U.S.C. 1981's prohibition on race discrimination); and *Gomez-Perez v. Potter*, 128 S. Ct. 1931 (2008) (construing the ADEA as making unlawful retaliation by a federal employer notwithstanding the absence of a direct prohibition on retaliation in the language of the statute). In both instances, the Court relied upon the fundamental purpose of the legislation in construing the existence of the claims.

- 9 -

Likewise, in *Robinson v. Shell Oil*, 519 U.S. 337 (1997), addressing the same provision at issue here -- § 704(a) -- the Supreme Court held that former employees are protected from reprisals, even though they are not specifically identified in the statute. *Robinson* emphasized that a court must evaluate not only the contested statutory language, but also "the specific context in which that language is used, and the broader context of the statute as a whole" [Id. at 341], and found this expanded interpretation of the term employee to be more consistent with the broader context of Title VII: "The EEOC quite persuasively maintains that it would be destructive of this purpose of the antiretaliation provision for an employer to be able to retaliate with impunity against an entire class of acts under Title VII--for example, complaints regarding discriminatory termination. We agree with these contentions and find that they support the inclusive interpretation of "employees" in § 704(a) that is already suggested by the broader context of Title VII." *Robinson*, 519 U.S. at 346.[1]

The same reasoning applies here.  Affording protection to employees who are targeted for punishment because of the protected activity of a close relative is wholly consistent with the remedial purpose of § 704(a), as defined by the Supreme Court in both *Burlington Northern* and *Robinson*.  This Court should not construe the statute to permit such reprisals.

And for thirty years, this construction of 704(a) has been the applicable law in the District of Columbia.  *See DeMedina v. Reinhardt*, 444 F. Supp. 573 (D.D.C. 1978)

---

[1] The Supreme Court has taken the same approach in construing the reach of Section 8(a) of the National Labor Relations Act.  In *NLRB v. Scrivener*, 405 U.S. 117 (1972), the Court interpreted the provision, which by its terms prohibits employers from "discharg[ing] or otherwise discriminat[ing] against an employee *because he has filed charges or given testimony under this Act*." (*29 U.S.C. § 158*) as protecting employees who engaged in informal activity, and not simply those who filed formal charges or provided formal testimony. *Id. at 121*.  The Court found such a construction to be more faithful to the underlying purpose of the legislation.

(Richey, J) (employee has standing to challenge retaliatory conduct due to protected

activity of her spouse); *Jefferson v. Milvets Sys. Tech.*, 986 F. Supp. 6, 12 (D.D.C. 1997)

(Sporkin J) (affirming jury verdict in favor of plaintiff on Title VII retaliation claim, and

citing *DeMedina* for proposition that retaliation for a spouse's protected activity violates

Title VII).

Foreshadowing the Supreme Court's approach to Section 704(a) in *Burlington*

*Northern* nearly thirty years later, Judge Richey found in *DeMedina* that permitting

retaliation against a close family member would contravene the fundamental purpose of

§704(a):

> It is thus necessary to consider defendant's argument that since
> plaintiff is not the person whose protected activities are allegedly being
> impeded by defendant's retaliatory actions, plaintiff fails to state a claim
> upon which relief can be granted under 42 U.S.C. § 2000e-3. . . While the
> language of this section indicates that Congress did not expressly consider
> the possibility of third-party reprisals -- i.e., discrimination against one
> person because of a friend's or relative's protected activities -- the very
> clear intent of Congress would be undermined by the construction
> defendant suggests. In enacting section 2000e-3, Congress unmistakably
> intended to ensure that no person would be deterred from exercising his
> rights under Title VII by the threat of discriminatory retaliation. Since
> tolerance of third-party reprisals would, no less than the tolerance of direct
> reprisals, deter persons from exercising their protected rights under Title
> VII, the Court must conclude, as has the only other court to consider the
> issue, *Kornbluh v. Stearns & Foster Co.*, 73 F.R.D. 307, 312 (N.D. Ohio
> 1976), that section 2000e-3 proscribes the alleged retaliation of which
> plaintiff complains.

*DeMedina*, 444 F. Supp. at 580.

Like the Secret Service here, the defendant federal employer argued that only the

plaintiff's husband could obtain relief for the reprisals against his wife.  Rejecting this

argument, Judge Richey noted:

> Such a construction of Title VII would produce absurd and unjust
> results, for while plaintiff's husband might be in a position to seek

> injunctive relief to prohibit future reprisals against his spouse, he would
> certainly not be in a position to seek back pay and/or retroactive
> promotion based on his spouse's employment denial. Thus, unless plaintiff
> herself is permitted to seek relief based on the denial of her employment
> application, the "make whole" purpose of Title VII would be frustrated.
> Such a result would contravene the express legislative history of Title
> VII, *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419-422, 45 L. Ed.
> 2d 280, 95 S. Ct. 2362 (1975), and would be unacceptable to this Court.
> Accordingly, the Court holds that plaintiff's allegation of reprisal for her
> husband's anti-discrimination activities at the USIA states a claim upon
> which relief can be granted under Title VII.

Id., at 580-81.

The same is true here. If defendant's motion is granted, and if a jury ultimately determines (in SA Ball's companion case) that the refusal to reassign Ms. Johnson to Florida was retaliatory, the Service will surely argue that Ms. Johnson (no longer a party) is entitled to no relief, and the Court has no power to order her transfer. This would continue to subject her to the Hobson's choice of either abandoning her federal career or continuing to live apart from her husband. [2]

Judge Richey's construction of §704(a) is further buttressed by the position of the Equal Employment Opportunity Commission (EEOC), the federal agency charged with enforcing the provisions of Title VII. The EEOC's compliance manual is unequivocal in its answer to this question: ""Title VII . . . prohibit[s] retaliation against someone so closely related to or associated with the person exercising his or her statutory rights that it would discourage that person from pursuing those rights." See *Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (emphasis added) (quoting EEOC

---

[2] Plaintiff proffers that the evidence will show at trial that Ms. Johnson has applied for employment with other federal agencies in Miami but has not received any offers. Indeed, in this challenging economic environment, it is not surprising that she also has had no luck obtaining offers of alternate employment in the private sector. Because Ms. Johnson and SA Ball purchased their home in Miami on the express assurance that she would retain her employment with the Service, they cannot afford for her to simply quit her job. To this day, they remain living apart.

Compliance Manual (CCH) P8006).  "The administrative interpretation of the [Civil Rights] Act by the enforcing agency is entitled to great deference."  *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34 (1971).  It should be followed here.

Defendant is certainly correct that there is division among the courts that have considered this issue. *Compare EEOC v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir. 1993) (stating, albeit in *dicta*, that "we agreed with the reasoning of the *DeMedina* court that a plaintiff's allegation of reprisal for a relative's anti-discrimination activities states a claim upon which relief can be granted under Title VII); [3] *Craig v. Suburban Cablevision*, 140 N.J. 623, 632 (N.J. 1995) (adopting reasoning of *DeMedina* court in construing retaliation prohibition under analogous state human rights act); *Gonzalez v. New York State Department of Correctional Services Fishkill Correctional Facility*, 122 F. Supp.2d 335 (N.D.N.Y. 2000) (same); *McKenzie v. Atlantic Richfield Co.*, 906 F. Supp. 572, 575 (D. Colo. 1995) (same), with *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 569 (3rd. Cir. 2002) (concluding that 704(a) does not expressly preclude retaliation against family members and that only Congress can address that gap in the law); *Holt v. JTM Industries, Inc.*, 89 F.3d 1224, 1227 (5th Cir. 1996) (same).

We respectfully suggest that the reasoning of those courts that have declined to construe Section 704(a) as precluding retaliation against family members is not persuasive and should not be adopted by this Court.  Indeed, the Third Circuit expressly

---

[3] However, the state of the law on this question in the Sixth Circuit is now unclear.  As defendant notes, a panel of the Court found that Section 704(a) protects a spouse from direct reprisals stemming from his wife's protected activity in *Thompson v. North American Stainless, LP,* 520 F.3d 644 (6th Cir. 2008) ("As such conduct would undermine the purposes of Title VII, we hold that such retaliatory action is prohibited.") However, that decision was very recently vacated and the issue was set for rehearing, *en banc.*  See 2008 LEXIS 16075 (July 28, 2008). The EEOC has appeared as amicus in that case, urging the *en banc* Court to adopt the panel's construction of § 704(a).  *Id.*

acknowledged that "[a]llowing employers to retaliate via friends and family [] would

appear to be *in significant tension with the overall purpose of the anti-retaliation*

*provisions*, which are intended to promote the reporting, investigation, and correction of

discriminatory conduct in the workplace." *Fogleman*, 283 F.3d at 569 (emphasis

supplied).  Before ultimately holding that it was up to Congress to cure what it perceived

to be a gap in the statute, the Third Circuit further elaborated on the import of its eventual

holding:

> Greg and the EEOC are correct that a literal reading of the anti-
> retaliation provisions is at odds with the policies animating those
> provisions. The anti-retaliation provisions recognize that enforcement of
> anti-discrimination laws depends in large part on employees to initiate
> administrative and judicial proceedings. *There can be no doubt that an*
> *employer who retaliates against the friends and relatives of employees*
> *who initiate anti-discrimination proceedings will deter employees from*
> *exercising their protected rights.*

*Fogleman*, 283 F.3d at 569 (emphasis supplied)..

We agree.  *Fogleman* was decided in 2002, before the Supreme Court's recent

decisions on workplace reprisals.  Indeed, in light of the Supreme Court's holdings in

*Humphries*, *Gomez-Perez and Burlington Northern,* construing the reach of retaliation

claims based on the primary purpose of the statute, we submit that the Third Circuit

might very well reach a different conclusion on this question were it considered today.

Of course, none of the authority cited by defendant is binding on this Court.  And

because defendant's proffered reading of the law would thwart the primary purpose of

Section 704(a), is inconsistent with the Supreme Court's most recent holdings regarding

workplace retaliation, and at odds with the executive agency charged with enforcing the

Act, plaintiff asks the Court to construe Section 704(a) consistent with the other courts in

the District of Columbia that have addressed the issue.  Employers should not be

permitted to retaliate with impunity by targeting the family members of those who exercise their civil rights.  Defendant's Motion should be denied.

B. **DEFENDANT VIEWED PLAINTIFF JOHNSON AS A PARTICIPANT IN HER HUSBAND'S PROTECTED ACTIVITY**

For the reasons discussed above, defendant is wrong to suggest that Plaintiff Johnson cannot assert an associational claim of retaliation under Section 704(a).  But even if defendant were correct in its ominous interpretation of the law, dismissal would still not be warranted here, because defendant viewed Ms. Johnson as a participant in her husband's EEO claim.  That means she is protected by § 704(a) in any event.

Long before plaintiff Johnson filed this claim in Court, defendant identified her as a witness in connection with her claims.  Indeed, defendant noticed Ms. Johnson for deposition in the *Moore, et al, v. Chertoff*, C.A. 00-953 litigation, even though Ms. Johnson, who is not a Special Agent, was *not* a member of that class.  [See Exhibit 1]

Even the authorities relied upon by defendant in its Motion to Dismiss would permit Ms. Johnson's claims to proceed on this basis.  For example, in *Fogleman*, the Third Circuit held that the plaintiff's theory that he was targeted for reprisal because the employer, albeit erroneously, believed him to be a witness for his father's EEO claim, was viable.  There was no dispute that the son, a manager for the hospital, had *not* in any way participated in the father's age or disability discrimination complaints.  But the court found evidence to believe that the employer perceived him to be supportive of the claim, because of a memorandum circulated by the human resources department discussing the claim and noting the son's status as a manager.  *Id.*, at 566.  Shortly thereafter, the plaintiff was terminated and brought suit alleging reprisal.  The Court of Appeals found that plaintiff's retaliation claim was viable:

> Unlike the interpretation of "such individual" to allow for third party claims advocated by Greg that we rejected in Section II.A, we do not believe that the perception theory contradicts the plain text of the anti-discrimination statutes. Rather, we read the statutes as directly supporting a perception theory of discrimination due to the fact that they make it illegal for an employer to "discriminate against any individual because such individual has [engaged in protected activity.]" . . . We have adopted this same approach in the labor law context, where we have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged in protected activity. *See Fogarty v. Boles*, 121 F.3d 886, 891 (3d Cir. 1997); *Brock v. Richardson*, 812 F.2d 121, 125 (3d Cir. 1987). Accordingly, we hold that if Greg can show, as he claims, that adverse action was taken against him because Mercy thought that he was assisting his father and thereby engaging in protected activity, it does not matter whether Mercy's perception was factually correct.

*Fogleman*, 283 F.3d at 571-572.

Here, defendant sought to depose Ms. Johnson in the *Moore* litigation. [4] Since she is not a member of that class, the only conceivable basis for doing so was its assumption that Ms. Johnson would be a witness for her husband, SA Ball, with respect to his unsuccessful efforts to obtain promotion and the damages he experienced from the race discrimination confronting him on the job. As in *Fogleman*, if defendant retaliated against Ms. Johnson based on its presumption that she would be a participant witness in her husband's EEO claim, such conduct is unlawful and actionable under § 704(a). Thus, even if the Court construes § 704(a) in the manner urged by defendant, plaintiff can state a claim and the Motion to Dismiss should be denied. [5]

---

[4] Although the class counsel consented to the deposition, the deposition ultimately did not take place.

[5] Plaintiff Johnson's case, C.A. 07-2192 has been consolidated with her husband's case, C.A. 07-2193. Since defendant apparently concedes that S.A. Ball states a viable claim of retaliation (as it has not filed a motion to dismiss S.A. Ball's complaint), and since the facts at issue in the two cases are identical, plaintiff Johnson asks that the Court permit both cases to immediately proceed to discovery so that the circumstances surrounding the notice of deposition of Ms. Johnson can be further explored. The parties submitted the Rule 16.3 Statement on March

**CONCLUSION**

For more than two years, Ramona Johnson and Tony Ball have lived apart because she cannot afford to leave her job, and the Secret Service refuses to reassign her. If a jury finds that the reason defendant reneged on its promise (as well as its long-standing practice of keeping families together), was SA Ball's EEO complaint, then defendant has violated Title VII.  Plaintiff Johnson states a viable claim under § 704(a), and if she ultimately prevails, should be entitled to complete relief, including an order requiring defendant to transfer her to Miami.  This Motion should be denied.

_____/s/_____
Richard A. Salzman  422497
Heller, Huron, Chertkof
Lerner, Simon & Salzman
1730 M St., NW Suite 412
Washington, DC 20036
(202) 293-8090
Counsel for Plaintiff

---

20, 2008 but further processing of the case was deferred pending an unsuccessful attempt at mediation.  The parties submitted a joint status report and proposed scheduling order on June 19, 2008.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Reginald Moore, et al.    )
   Plaintiffs,     )
            )
            )   Civil Action No.
            )   00-CV-0953 (RWR/DAR)
     v.      )
            )
Michael Chertoff, Secretary  )
Department of Homeland   )
Security         )
            )
   Defendant.    )
_____)

## <u>NOTICE OF DEPOSITION</u>

   PLEASE TAKE NOTICE that the defendant hereby notices the deposition of

Ramona Johnson.  The deposition will take place at 10:00 a.m. at the United States

Attorney's Office for the District of Columbia, Civil Division, 501 Third Street, NW,

Fourth Floor, Washington, D.C. 20530 on January 26, 2007.  The deposition will be

taken under oath before a court reporter by stenographic means and will continue from

day to day until completed.

        _____/s_____
        BENTON G. PETERSON
        Assistant United States Attorney
        Judiciary Center Building
        555 4th Street, N.W. B Civil Division
        Washington, D.C.  20530
        (202) 514-7238 514-8780 (Facsimile)
         Benton.Peterson@usdoj.gov

**Of Counsel:**
Edith Shine
Donna L. Cahill
U.S. Secret Service
Office of the Chief Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Notice of Deposition has been sent by

first-class mail, postage prepaid and electronic mail this _30th____ day of November, 2006 to:


E. Desmond Hogan
Deborah L. Boardman
Hogan & Hartson
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109


and


John P. Relman, Esq.
Jennifer I. Klar, Esq.
Relman & Associates PLLC
1225 Nineteenth Street, N.W.
Suite 600
Washington, DC 20036


_____/s_____
BENTON G. PETERSON Bar # 1029849
Assistant United States Attorney
United States Attorney's Office
Judiciary Center - Civil Division
555 Fourth Street, N.W.
Washington, D. C. 20530
(202) 514-7238